[Crim. No. 16554. In Bank. May 15, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES R. BURNICK, Defendant and Appellant.

COUNSEL

Barry David Kohn for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Herbert L. Ashby, Chief Assistant Attorneys General, William E. James, Assistant Attorney General, William R. Pounders and Joel S. Moskowitz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Professor Wigmore perceptively observes that "The mental condition of one whose mind is so deranged as to require imprisonment for his own and others' good is indeed pitiable. But the mental attitude of one who is falsely found insane and relegated to life imprisonment is

[May 1975]

beyond conception. No greater cruelty can be committed in the name of the law." (5 Wigmore on Evidence (Chadbourn rev. 1974) § 1400, p. 201.)

Surely it is no less cruel to falsely find a man to be a "mentally disordered sex offender" and confine him indefinitely in a prison-like state mental institution. Against such grievous errors the law has erected sturdy bulwarks of procedure. In the quoted paragraph, for example, Professor Wigmore stresses the importance of the right of confrontation. No less critical is the standard of proof—the degree of persuasion which the plaintiff must achieve in the minds of the judge or jury in order to invoke the coercive powers of the state against the defendant. The law wisely proportions this standard to the gravity of the consequences of an erroneous judgment: thus a criminal charge must be proved beyond a reasonable doubt, while an ordinary claim of breach of contract may be established by a preponderance of the evidence. (See generally *In re Winship* (1970) 397 U.S. 358, 369-372 [25 L.Ed.2d 368, 378-380, 90 S.Ct. 1068] (Harlan, J., concurring).)

In the case at bar we are called upon to determine the proper standard of proof in mentally disordered sex offender proceedings. As we shall explain, we reject the asserted right of the state to publicly brand a man as a mentally disordered sex offender and lock him up for an indeterminate period in a maximum security mental hospital on a mere preponderance of the evidence, i.e., "under the same standard of proof applicable to run-of-the-mill automobile negligence actions." (Fn. omitted.) (*Murel* v. *Baltimore City Criminal Court* (1972) 407 U.S. 355, 359 [32 L.Ed.2d 791, 794, 92 S.Ct. 2091] (Douglas, J., dissenting from dismissal of certiorari).) We hold, rather, that in order to comply with the requirements of the due process clauses of the California and federal Constitutions, so drastic an impairment of the liberty and reputation of an individual must be justified by proof beyond a reasonable doubt.

The case is before us on an appeal by defendant Burnick (Pen. Code, § 1237, subd. 1) from an order adjudging him to be a mentally disordered sex offender within the meaning of Welfare and Institutions Code section 6300.[1] The code provides that when a person is convicted of any offense

---

[1]Section 6300 defines a mentally disordered sex offender as "any person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." The earlier statutory term for such a person was "sexual psychopath." (See former § 5500.)

Unless otherwise specified, all statutory references in this opinion are to the Welfare and Institutions Code.

the trial judge may adjourn the proceedings and certify the person to the superior court for a hearing if it appears to the judge there is probable cause for believing him to be a mentally disordered sex offender. (§ 6302.) This procedure was followed in the case at bar.[2] The court found Burnick to be a mentally disordered sex offender, and committed him to Atascadero State Hospital for an indeterminate period. (§ 6316.) Burnick demanded a jury trial of the issue (§ 6318), but subsequently waived a jury and went to trial before the court. Prior to the taking of testimony Burnick requested that the court apply the standard of proof beyond a reasonable doubt in making its determination. The court refused the request and ruled that it would decide the case by a preponderance of the evidence. Under that standard, Burnick was again found to be a mentally disordered sex offender and a second order was made committing him to Atascadero for an indefinite period. (§ 6321.)

I

The importance of the standard of proof in mentally disordered sex offender proceedings is well illustrated by the case at bar. The evidentiary facts are uncomplicated. From psychiatric interviews and probation and other reports it developed that at age 12 Burnick had certain limited sexual contacts with men. He married, apparently while still a teenager, but his wife died in childbirth. For several years after her death he had no sexual relations with women. At the time of the events in question he was 28 years old, and was employed in a shop selling psychedelic art and materials. He became acquainted with two boys aged 13 and 15 years, and the three were friends for approximately a year. In the course of the latter months of that year they engaged in four to six consensual sexual acts, which were the basis of the charges brought against Burnick. He has no record whatever of violence, or of previous violations of law.

From these facts three psychiatrists, all eminently qualified by training and experience as experts on the subject of mentally disordered sex offenders, drew widely differing conclusions as to both Burnick's diagnosis and prognosis.

[2]The record before us is silent as to the particular offense of which Burnick was convicted. The Attorney General states—and for present purposes we may take it as true—that he was convicted in the municipal court of violations of Penal Code section 647a (conduct which "annoys or molests" a person under the age of 18) and section 272 (contributing to the delinquency of a person under the age of 21). Each is a misdemeanor, punishable by a fine and/or a brief county jail sentence.

Dr. Alvin Davis, the sole witness for the prosecution, gave as his opinion that Burnick was a homosexual pedophile, i.e., a man who engages in sexual activities with adolescent boys; that he was likely to repeat such acts in the future; and that the conduct would be "dangerous to the health and safety of others" (§ 6300), but only in the sense that youths who were still "undecided" about their sexual identity might be influenced towards homosexuality because of their experiences with Burnick. On cross-examination, Dr. Davis conceded that a child's sexual identity begins to be formed early in life, long before puberty; that it is possible Burnick would limit his contacts to youths who were already homosexually oriented; and that his conduct would pose no danger to those who were either heterosexuals or confirmed homosexuals.

Two psychiatrists testified for the defense, and their views were in clear conflict with those of Dr. Davis. Dr. Michael Coburn denied that Burnick was a homosexual: although he had participated in both heterosexual and homosexual conduct on occasion, "he is not a homosexual in the commonly understood meaning of the term. He is predominantly heterosexual in his past." Nor was he pedophilic: "I don't find him to be sexually attracted to pre-pubital human beings of either sex. . . . His interest is not in children but in sexually mature individuals, whether or not their age be mature." Dr. Coburn's diagnosis was twofold: that Burnick had a highly immature personality, and that he suffered from a long-standing depression resulting from an inability to deal in a realistic way with the death of his wife.

The witness acknowledged that in standard psychiatric nomenclature both immature personality and depression are classified as "character disorders." But whether or not that general term is the equivalent of the statutory phrase, "mental defect, disease, or disorder" (§ 6300), Dr. Coburn firmly concluded that Burnick was not "dangerous to the health and safety of others." Although it was "possible" that he might again engage in acts such as those charged, it was not "likely" because the events had caused him increased guilt feelings and decreased sexual pleasure. In any case, Dr. Coburn was of the opinion that isolated acts such as here involved would have no more than a slight effect on the sexual development of even an "undecided" adolescent.[3]

---

[3] The doctor explained that such contacts could be "a factor" in the youth's development, but "So is how his first three or four . . . heterosexual dates treat him. A couple of bad rejections by a heterosexual partner would do maybe more damage as far as making [him] a person unable to have further heterosexual relations."

Dr. Andre Tweed also refused to classify Burnick as a homosexual, stressing his heterosexual activities. Rather, he found Burnick to be an immature person whose homosexual experiences were entirely situational. The witness recognized that immature personality is classified as a "character disorder" in professional terminology, but explained that the label merely means that "your behavior does not conform to that which society sets up at that particular moment as being the so-called norm."[4]

Dr. Tweed further stated that in his opinion Burnick was not a pedophile. The youths with whom he was involved were not children, and in the doctor's opinion had probably initiated the encounters themselves. Adolescents were not Burnick's primary interest: "I don't believe that he is the type of individual who would go out and actively solicit activities with that particular age group." Rather, his sexual feelings were "directed more toward consenting adults." In any event, according to Dr. Tweed, the average adolescent today has generally had "some type of sexual experience, heterosexual or homosexual, and it doesn't affect him one way or the other."

For these reasons Dr. Tweed fully agreed with Dr. Coburn's conclusion that Burnick was not "dangerous to the health and safety of others" and was not a mentally disordered sex offender.

No other witness testified, and no documentary evidence was introduced. In oral argument defense counsel sharply challenged the adequacy of the People's proof of each element of their case, urging for example that when we deal with "the possible deprivation of liberty of an individual for his natural life . . . we need something more than just mere personality disorder," and that the speculative risk of his influencing some youths towards homosexuality is not "a sufficient danger to take away Mr. Burnick's liberty for such a prolonged period of time." The court nevertheless found, by an asserted preponderance of the evidence, that Burnick was a mentally disordered sex offender within the meaning of section 6300.

## II

The record shows that the trial court felt compelled to decide the issue by a preponderance of the evidence because of the statutory directive

---

[4]By way of example the doctor stated, "if the Legislature were to say tomorrow, today or tomorrow, that it's perfectly all right to engage in homosexual activities . . . it would no longer be characterized as a character disorder. It would become so-called normal behavior because it would not then be in conflict with society, because society [would have] changed its standards at that particular time."

that in mentally disordered sex offender proceedings "The trial shall be had as provided by law for the trial of civil causes . . . ." (§ 6321.) But it is apparent from the face of the statute that it does not mandate any particular standard of proof, nor does any other provision of the mentally disordered sex offender law. (See, e.g., § 6316.) ■ The matter is therefore controlled by the general provisions of section 115 of the Evidence Code, which declares in relevant part that *"Except as otherwise provided by law,* the burden of proof requires proof by a preponderance of the evidence." (Italics added.) According to the comment to that section by the Assembly Committee on Judiciary, the exception means, "unless a heavier or lesser burden of proof is specifically required in a particular case by constitutional, statutory, *or decisional law."* (Italics added.) Evidence Code section 160 defines "law" in the same tripartite terms, and the draftsman's comment thereto reiterates that "a reference [in the Evidence Code] to 'law' includes the law established by judicial decisions as well as by constitutional and statutory provisions." Nor is this surprising, as the choice of standard of proof "is the kind of question which has traditionally been left to the judiciary to resolve . . . ." (Fn. omitted.) (*Woodby* v. *Immigration Service* (1966) 385 U.S. 276, 284 [17 L.Ed.2d 362, 368, 87 S.Ct. 483].)

That question, accordingly, is not answered by the People's reliance on the general proposition that mentally disordered sex offender proceedings are "civil in nature." (See, e.g., *In re Bevill* (1968) 68 Cal.2d 854, 858 [69 Cal.Rptr. 599, 442 P.2d 679].) Nor is it necessary to inquire into the constitutionality of the quoted language of section 6321 or Evidence Code section 115. Rather we apply those statutes, and proceed to determine whether the standard of proof beyond a reasonable doubt is "otherwise required" in mentally disordered sex offender proceedings. Yet in so doing we are moved by constitutional considerations of the highest order, inasmuch as we discharge our duty to insure that no person be deprived of his liberty without the due process of law guaranteed by article I, section 7, subdivision (a), of the California Constitution, and the Fourteenth Amendment to the United States Constitution.[5]

[5]Similarly, the Legislature has not specified the standard of proof for involuntary commitment of persons under our general mental health law (Welf. & Inst. Code, § 5000 et seq., known as the Lanterman-Petris-Short Act), but has provided that such proceedings shall be conducted "in accordance with constitutional guarantees of due process of law and the procedures required under Section 13 [now § 7, subd. (a)] of Article 1 of the Constitution of the State of California." (§ 5303.) As in the case at bar, it will be for the courts to decide which standard of proof is necessary to comport with those "guarantees and procedures" in view of the consequences to the individual of a commitment under the Lanterman-Petris-Short Act.

In the absence of California cases in point, we find guidance in recent decisions of the United States Supreme Court. The first is *Specht* v. *Patterson* (1967) 386 U.S. 605 [18 L.Ed.2d 326, 87 S.Ct. 1209], dealing with a "sexual psychopath" statute essentially similar in outline and purpose to the legislation here challenged. The Colorado Sex Offenders Act provided that if the trial court was of the opinion that a defendant convicted of a specified sex offense "constitutes a threat of bodily harm to members of the public, or is an habitual offender and mentally ill," he could be sentenced to an indeterminate term of one day to life upon a psychiatric examination and report. There was no formal hearing under the statute.

A defendant who had been thus sentenced sought federal habeas corpus, and the United States Supreme Court unanimously reversed a denial of that remedy. The court expressly declined (at p. 608 [18 L.Ed.2d at p. 329]) to extend to this area its holding in *Williams* v. *New York* (1949) 337 U.S. 241, 249-250 [ 93 L.Ed. 1337, 1343-1344, 69 S.Ct. 1079], that due process does not require a full hearing with right of cross-examination at the time of fixing sentence. Rather, the court reasoned, "These commitment proceedings *whether denominated civil or criminal* are subject both to the Equal Protection Clause of the Fourteenth Amendment as we held in *Baxstrom* v. *Herold,* 383 U.S. 107, and to the Due Process Clause. We hold that the requirements of due process were not satisfied here.

"The Sex Offenders Act does not make the commission of a specified crime the basis for sentencing. It makes one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. *That is a new finding of fact* [citation] *that was not an ingredient of the offense charged.* The punishment under the second Act is criminal punishment even though it is designed not so much as retribution as it is to keep individuals from inflicting future harm." (Italics added; fn. omitted.) (386 U.S. at pp. 608-609 [18 L.Ed.2d at p. 329].)

This language repays close examination. To begin with, the court here disregarded the "civil label of convenience" one month before its landmark decision in *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428].[6] Nor was the court deceived by the fact that the purpose of

---

[6]In *Gault,* of course, the court firmly interred that label for all constitutional purposes. A fitting epitaph might be the court's conclusion that "commitment is a deprivation of

the confinement was not primarily retribution. Instead the court penetrated directly to the substance of the proceeding and examined the relationship between the original conviction and the ensuing commitment inquiry, holding that the latter must satisfy both equal protection and due process. The court noted that the purpose of the commitment proceeding was to determine whether the defendant "constitutes" a danger to others or "is" a mentally ill habitual offender. That determination, said the court, "is a new finding of fact . . . that was not an ingredient of the offense charged."[7]

An identical analysis applies to the California mentally disordered sex offender law. ■ We begin with the simple grammatical fact that our statute speaks in the present rather than the future tense: section 6300 defines a mentally disordered sex offender as a person (1) who suffers, i.e., at the present time, from a "mental defect, disease, or disorder" and (2) who "is" thereby predisposed to commit sex crimes to such a degree that (3) he "is" a danger to others. These are inquiries into the defendant's *present* state of mind and risk of harm, and they are indistinguishable from the issues raised by the statute involved in *Specht,* i.e., whether the defendant "is" a mentally ill habitual offender or "constitutes" a danger to others. As in *Specht,* therefore, their resolution. in the commitment proceeding is a "new finding of fact . . . that was not an ingredient of the offense charged."

The *Specht* court then listed the several respects in which the Colorado statute failed to provide due process: that constitutional guarantee "requires that [the defendant] be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed." (386 U.S. at p. 610 [18 L.Ed.2d at p. 330].) We recognize that the right to jury trial and the standard of proof beyond a reasonable doubt are not mentioned among the rights thus enumerated. For at least two reasons,

---

liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' " (*Id.* at p. 50 [18 L.Ed.2d at p. 558].) (For a witty critique of the use and abuse of such labels in civil commitment proceedings, see Dershowitz, *Preventive Confinement: A Suggested Framework for Constitutional Analysis* (1973) 51 Tex.L.Rev. 1277, 1295-1299.)

[7]This holding was reiterated in a passage in *Humphrey* v. *Cady* (1972) 405 U.S. 504, 511 [31 L.Ed.2d 394, 403-404, 92 S.Ct. 1048], in which the court emphasized that under the Wisconsin Sex Crimes Act five-year renewal commitments of persons who are determined to be "dangerous" to the public because of their mental or physical "deficiency, disorder or abnormality" are "based on new findings of fact . . . ." The *Humphrey* opinion cites *Specht* at page 508 of 405 U.S. [page 402 of 31 L.Ed.2d].

however, the omission of such matters from the *Specht* opinion is without significance.

First, a careful reading of *Specht* and the lower court opinions in that case shows that the petitioner did not specifically claim the right to a jury trial or proof beyond a reasonable doubt; those issues, accordingly, were not presented to the United States Supreme Court. ■ In the federal system no less than in California, cases are not authority for propositions not considered. (*In re Tartar* (1959) 52 Cal.2d 250, 258 [339 P.2d 553], and cases cited.) Second, the precise holding of *Specht* was that the Colorado statute was deficient in due process "as measured by the requirements of the Fourteenth Amendment." (386 U.S. at p. 611 [18 L.Ed.2d at p. 331].) But as of the date of *Specht* (1967) the Supreme Court had not yet held that the due process clause of the federal Constitution requires the states to guarantee a jury trial in criminal cases and the protection of proof beyond a reasonable doubt.[8] The awaited rulings of the high federal court did not come until 1968 in the case of jury trial (*Duncan* v. *Louisiana,* 391 U.S. 145, 149 [20 L.Ed.2d 491, 496, 88 S.Ct. 1444]) and 1970 for proof beyond a reasonable doubt (*In re Winship, supra,* 397 U.S. 358, 364 [25 L.Ed.2d 368, 375]; see *People* v. *Vann* (1974) 12 Cal.3d 220, 227-228 [115 Cal.Rptr. 352, 524 P.2d 824]).

Yet if *Specht* did not prophesy each and every step in the future development of the role that due process must play in these commitment proceedings, it clearly pointed the way. The court quoted the following language from *United States* v. *Maroney* (3d Cir. 1966) *supra,* 355 F.2d 302, 312: "It is a separate criminal proceeding which may be invoked after conviction of one of the specified crimes. Petitioner therefore was entitled to a full judicial hearing before the magnified sentence was imposed. At such a hearing the requirements of due process cannot be satisfied by partial or niggardly procedural protections. A defendant in such a proceeding is entitled to *the full panoply of the relevant protections*

---

[8]This chronology is emphasized in *United States* v. *Maroney* (3d Cir. 1966) 355 F.2d 302, a decision strongly relied on in *Specht.* There a Pennsylvania sexual psychopath proceeding essentially identical to the Colorado law challenged in *Specht* was attacked on the ground, inter alia, that its lack of a jury trial violated due process. The court was of the opinion that "the guarantee of jury trial would apply to [the Pennsylvania] proceeding if the Fourteenth Amendment makes it applicable in state criminal cases," but explained that the question remained "whether the right to trial by jury, guaranteed as it is by the Sixth Amendment, is within the protection of the Fourteenth Amendment prohibition against deprivation of liberty without due process of law." (*Id.* at p. 313.) Noting that the United States Supreme Court had not yet squarely answered that question, the court deferred in the meanwhile to the views of the Pennsylvania courts on the·matter.

*which due process guarantees in state criminal proceedings.* He must be afforded *all those safeguards which are fundamental rights and essential to a fair trial,* including the right to confront and cross-examine the witnesses against him." (Italics added.) The *Specht* court unequivocally adopted this language as its own, saying, "We agree with that view." (386 U.S. at p. 610 [18 L.Ed.2d at p. 330].)

In light of the fundamental similarity between the sexual psychopath proceedings challenged in *Specht* and in the case at bar, the question before us is whether proof beyond a reasonable doubt is among the "full panoply of the relevant protections which due process guarantees in state criminal proceedings." The answer was definitively given by the Supreme Court in the second case here in point, *In re Winship* (1970) *supra,* 397 U.S. 358.

As noted above, *Winship* declared that in criminal cases the due process clause protects the accused against conviction except upon proof beyond a reasonable doubt. Particularly important for our purposes is the court's dual justification for that rule: "The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may *lose his liberty* upon conviction and because of the certainty that he would be *stigmatized* by the conviction." (Italics added.) (397 U.S. at p. 363 [25 L.Ed.2d at p. 375].) The court then recalled (at pp. 365-366 [25 L.Ed.2d at pp. 375-377]) that *Gault* had shown how the same two consequences flow from an adjudication of juvenile delinquency.[9] Accordingly, the court concluded (at p. 367 [25 L.Ed.2d at p. 377]) that the safeguard of proof beyond a reasonable doubt must extend to juvenile proceedings as well: judicial intervention in the child's life for his own good, said the court, "cannot take the form of subjecting the child to the stigma of a finding that he violated a criminal law and to the possibility of institutional confinement on proof insufficient to convict him were he an adult." (Fn. omitted.)

Again the Supreme Court's analysis applies equally—if not more so—to the California mentally disordered sex offender law. ■ First, as we recognized in *Gross v. Superior Court* (1954) 42 Cal.2d 816, 821

---

[9]"We made clear in that decision that civil labels and good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts, for '[a] proceeding where the issue is whether the child will be found to be "delinquent" and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution.' "

[270 P.2d 1025], when a man is charged with being a mentally disordered sex offender "His liberty is at stake." That threat is fulfilled in the order of commitment. In common with all those confined against their will for treatment of mental illness, a person committed under our statute suffers a "massive curtailment of liberty" (*Humphrey* v. *Cady* (1972) *supra,* 405 U.S. 504, 509 [31 L.Ed.2d 394, 402]). Indeed, his personal deprivation is far in excess of that experienced by a youth adjudged to be a juvenile delinquent.

To begin with, the juvenile may or may not be confined in an institution; other less drastic methods of control are available, including placement in a "suitable family home" or release on probation. (Welf. & Inst. Code, § 727 et seq.) By contrast, if the court determines that a mentally disordered sex offender could benefit from treatment and that criminal proceedings against him should not be resumed, it has no option but to order him committed "for placement in a state hospital." (§§ 6316, 6321.) There is no half-way house, no outpatient alternative.

Nor is there any doubt that such commitment to a "state hospital" results in a real deprivation of liberty. Like all persons found to be treatable mentally disordered sex offenders in California, Burnick was committed by the court to Atascadero State Hospital. Let us not deceive ourselves as to the nature of that institution. (Cf. *In re Gault* (1967) *supra,* 387 U.S. 1, 27 [18 L.Ed.2d 527, 545-546].) It was frankly described as follows by a distinguished body of the medical profession.[10] "In its physical appearance, this is much more like a prison than a hospital. In its architectural planning, it disregards the modern psychiatric concept of the therapeutic community. There are bare corridors, bars, iron gates, rows of cells—all the stigmata of punishment rather than treatment. Patients who occupy individual rooms are locked out of them during the day and have no opportunity to withdraw for privacy. Patients in wards have a reasonable amount of mobility from one area of the hospital to another, although security precautions are in evidence everywhere. . . . [¶] Externally, the plant has a misleadingly attractive appearance. Internally, despite its dehumanizing attributes, it is well-maintained and well-equipped and might be characterized as a sanitary dungeon." Other

---

[10]Observations and Comments Based on a Survey of California State Mental Facilities by the California Medical Association, January 18, 1965, page 21. This survey was conducted by the California Medical Association at the request of the Department of Mental Hygiene, supplemented by a resolution of the state Senate. In the case of Atascadero the institution was visited by a team of five physicians, four of whom were psychiatrists.

observers have confirmed this description.[11] And lest it be thought that only outsiders characterize this institution as essentially indistinguishable from a prison, consider the testimony of Dr. Harold M. Rogallo, senior psychiatrist on the Atascadero staff:[12] Dr. Rogallo identified Atascadero as the only "maximum security" hospital in the Department of Mental Hygiene; noting the fact that "it is all locked and it is under strict supervision, and we have approximately fifty security officers for a population of about thirteen hundred and fifty patients," Dr. Rogallo concluded unequivocally, "Our hospital is pretty much bordering, you might say, [on] a correction facility. . . ." We shall not presume to contradict this appraisal by a senior staff member of the very institution in question.

Not only is the mentally disordered sex offender's loss of freedom more severe than that of the juvenile, it is also of a much longer duration. Any confinement of the juvenile is ordinarily limited by law to a few years at most, terminating automatically when he reaches age 21 or shortly thereafter. (Welf. & Inst. Code, §§ 1769-1771; but see §§ 1800-1803.) ■ A person adjudicated a mentally disordered sex offender, however, is committed "for an indeterminate period" (Welf. &

---

[11]"The physical facility itself is a unique combination of prison and hospital, seemingly symbolic of the uncertain position the institution occupies between the forces of law and psychiatry. Situated three miles south of the small town of Atascadero, on a tract of 1200 acres, it is equally isolated from Los Angeles and San Francisco and cut off from any great hospital or university. Although the outside appearance of the building conveys the impression of an ordinary hospital and the modern, tastefully furnished lobby complements this idea, entrance through the double-doored 'sallyport' jolts the visitor to the stark reality that this is a maximum security prison. Two immense corridors, painted a depressing prison gray and filled with men, lead at right angles away from the sally-port entrance and give access to the cells and dormitories of the twenty-seven wards." (Nasatir, Dezzani, & Silbert, *Atascadero: Ramifications of a Maximum Security Treatment Institution* (1966) 2 Issues in Criminology 29, 30-31.)

After noting certain hospital-like aspects of the "public" areas of the institution, the authors continue (at p. 31): "Unfortunately this impression fades upon viewing the wards and cells which are the patients' home during their stay at this facility. The coffin-like individual cells are devoid of any element of homeliness or individuality. Hospital regulations forbid any attempt by the patient to decorate or humanize his cell. The bars on the windows, cleverly concealed from the outside, are painfully evident from within. The ward day room serves as living room for the entire ward population, therapy center for those undergoing treatment, and a bedroom for those for whom there is no space in cells or dormitories. Most patients sleep in dormitories that house twelve to fifteen patients. Periodically these men are shifted from ward to ward, taking their meagre personal possessions with them in a box as they go." (Fn. omitted.)

[12]Dr. Rogallo gave this testimony during the trial of the companion case of *People v. Feagley, post,* page 338 [121 Cal.Rptr. 509, 535 P.2d 373]. It is transcribed in the record of that case filed with this court, and we may therefore take judicial notice of it. (Evid. Code, §§ 452, subd. (d)(1), 459.)

Inst. Code, §§ 6316, 6326). The statute means what it says: the individual can be detained for any length of time whatever—potentially for life. Moreover, release depends not on his reaching a certain age or the end of a fixed term, but on the "opinion" of the hospital superintendent that he will not "benefit" from further treatment and is no longer "a danger" (§ 6325)—a highly discretionary standard difficult to review. Under our statutory scheme, therefore, a mentally disordered sex offender's deliverance can be many years in the uncertain future.[13]

The second justification for the standard of proof beyond a reasonable doubt relied on in *Winship* is the "stigma" and loss of "good name" (397 U.S. at pp. 363, 364, 367 [25 L.Ed.2d at pp. 374, 375, 377]) which follow from a criminal conviction or an adjudication of juvenile delinquency. ▪ Surely no less a stigma results from a judicial pronouncement that a man is both "mentally disordered" and a "sex offender." In the ideal society, the mentally ill would be the subjects of understanding and compassion rather than ignorance and aversion. But that enlightened view, unfortunately, does not yet prevail. The stigma borne by the mentally ill has frequently been identified in the literature: "a former mental patient may suffer from the social opprobrium which attaches to treatment for mental illness and which may have more severe consequences than do the formally imposed disabilities. Many people have an 'irrational fear of the mentally ill.' The former mental patient is likely to be treated with distrust and even loathing; he may be socially ostracized and victimized by employment and educational discrimination. Finally, the individual's hospitalization and posthospitalization experience may cause him to lose self-confidence and self-esteem. [¶] The legal and social consequences of commitment constitute the stigma of mental illness, a stigma that could be as socially debilitating as that of a criminal conviction." (Fns. omitted.) (*Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1200-1201; accord, Rosenhan, *On Being Sane in Insane Places* (1973) 13 Santa Clara Law. 379, 385, and authorities cited in fn. 11.)

When to that stigma is added a charge of unlawful sexual behavior, the shame is complete. This is not an open question in California, as our courts have recognized the odium which commonly attaches to the status of mentally disordered sex offender. Thus in *People* v. *Fuller* (1964) 226 Cal.App.2d 331, 335 [38 Cal.Rptr. 25], the court noted the Legislature

---

[13]This conclusion is unaffected by the statutory authority of the court to obtain progress reports on the person from the superintendent of the state hospital. (§§ 6317, 6327.) In each case judicial intervention is wholly discretionary.

has provided that the greatest care is to be taken "before the stigma of sexual psychopathy is finally attached to an individual . . . ." And a subsequent discharge from that commitment does not moot his appeal because, we explained in *People* v. *Succop* (1967) 67 Cal.2d 785, 790 [63 Cal.Rptr. 569, 433 P.2d 473], the defendant is entitled to the opportunity to "clear his name" of the adjudication that he is a mentally disordered sex offender.

In fact, the stigma of such an adjudication is greater than that of juvenile delinquency. The latter proceedings are conducted in privacy: the statute flatly declares that "the public shall not be admitted" (Welf. & Inst. Code, § 676; see also § 675). Moreover, five years after the juvenile court's jurisdiction terminates, the judge or probation officer "may destroy all records and papers in the proceedings concerning the minor." (§ 826, subd. (a).) No such confidentiality surrounds a mentally disordered sex offender trial, which is open to the public and hence to the news media; and such trial, of course, results in permanently accessible public records of the event and its outcome.

Secondly, to the extent they do become known, acts of juvenile misconduct are often minimized or forgiven on such commonplace rationalizations as "boys will be boys" or "youth will have its fling," coupled with a belief of folk psychology that the miscreant is just "going through a stage" and with maturity will "outgrow" his bad habits. No such indulgence is shown towards the convicted mentally disordered sex offender, however immature or impulsive he may be. He remains forever a pariah, branded with the twin marks of mental and sexual abnormality.

■ It follows from the foregoing that the standard of proof in mentally disordered sex offender proceedings must be as high as it is in juvenile delinquency proceedings—to wit, proof beyond a reasonable doubt. Anything less will fall short of providing the level of due process required by the California and federal Constitutions.

The message of the Supreme Court decisions has been clearly understood by our brethren on the federal bench. Speaking of a sexual psychopath law providing for indeterminate commitment, the First Circuit Court of Appeals recognized "the inmate's right to avoid a grievous loss of liberty and lifetime stigma except under the most rigorous safeguards." (*Sarzen* v. *Gaughan* (1st Cir. 1973) 489 F.2d 1076, 1083.) In holding that a person involuntarily committed to a state mental hospital has a constitutional right to treatment, the Fifth Circuit Court of

Appeals took special note of "the indisputable fact that civil commitment entails a 'massive curtailment of liberty' in the constitutional sense. Humphrey v. Cady, 1972, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394. The destruction of an individual's personal freedoms effected by civil commitment is scarcely less total than that effected by confinement in a penitentiary. Indeed, civil commitment, because it is for an indefinite term, may in some ways involve a more serious abridgement of personal freedom than imprisonment for commission of a crime usually does. Civil commitment involves stigmatizing the affected individuals, and the stigma attached, though in theory less severe than the stigma attached to criminal conviction, may in reality be as severe, or more so." (Fn. omitted.) (*Donaldson* v. *O'Connor* (5th Cir. 1974) 493 F.2d 507, 520, cert. granted (1974) 419 U.S. 894 [42 L.Ed.2d 138, 95 S.Ct. 171].)

From these premises the courts have drawn the conclusion that the due process clause requires proof beyond a reasonable doubt in proceedings leading to involuntary commitment of persons found to be both mentally ill and dangerous. Thus in an opinion authored by Judge Robert A. Sprecher of the Seventh Circuit Court of Appeals for a three-judge district court, it was declared that the reasons for the holding in *Winship* as to juvenile delinquents apply a fortiori to commitments of the mentally ill: "The [*Winship*] argument for a stringent standard of proof is more compelling in the case of a civil commitment in which an individual will be deprived of basic civil rights and be certainly stigmatized by the lack of confidentiality of the adjudication. We therefore hold that the state must prove beyond a reasonable doubt all facts necessary to show that an individual is mentally ill and dangerous." (*Lessard* v. *Schmidt* (E.D.Wis. 1972) 349 F.Supp. 1078, 1095, vacated on other grounds sub nom. *Schmidt* v. *Lessard* (1974) 414 U.S. 473 [38 L.Ed.2d 661, 94 S.Ct. 713]; accord, *Denton* v. *Commonwealth* (Ky. 1964) 383 S.W.2d 681.)

Again, the Court of Appeals of the District of Columbia Circuit unanimously so held in *In re Ballay* (1973) 482 F.2d 648 [157 App.D.C. 59]. Reversing a judgment of commitment because the jury was permitted to find by a mere preponderance of the evidence that Ballay was mentally ill and likely to be dangerous, the court held the due process clause requires such issues to be proved beyond a reasonable doubt. Its detailed and well reasoned opinion makes many points relevant to our present concern, including the absence of any additional administrative burden if the standard of proof beyond a reasonable doubt is used (*id.* at pp. 656, 663) and the fact that psychiatric testimony

either diagnosing mental disorder or predicting future dangerousness is "far from satisfactory" and has "never been characterized by a high degree of accuracy." (*Id.* at pp. 665, 666.)

In its concluding argument the *Ballay* court analyzed the *Winship* decision and applied the Supreme Court's rationale to the case at hand (*id.* at p. 668): "the loss of liberty—the interest of 'transcending value' [citing *Speiser* v. *Randall* (1958) 357 U.S. 513, 525 (2 L.Ed.2d 1460, 1472)]—is obviously as great for those civilly committed as for the criminal or juvenile delinquent. Indeed, it may be greater in the former since the statute provides for indefinite commitment. The only question is whether the 'stigma' associated with involuntary civil commitment is as severe as the stigma of finding that an individual committed a crime. Even accepting recent medical advances, current studies clearly indicate the fallacy of contending that most people view mental illness as a disease similar to any physical ailment of the body." (Fns. omitted.)[14] The court then reasoned as follows (*id.* at p. 669): "In *Winship,* the Court concluded that while the consequences of being adjudged a juvenile delinquent were not identical to being adjudged a criminal, the differences were not sufficient to support a distinction in the standard of proof. This was despite the fact that, unlike involuntary civil commitment, being adjudged delinquent did not deprive the child of his civil rights nor did the statute, which called for confidentiality, expose him to the stigma of a public hearing. We cannot help but conclude that the forcefully committed civil patient has at stake interests of equivalent proportions."

To summarize, *Specht* teaches us that "whether denominated civil or criminal," sexual psychopath proceedings are subject to the "full panoply" of the protections of the due process clause, and an adverse determination in such proceedings is "a new finding of fact"; in turn, *Winship* instructs that the due process clause requires proof beyond a reasonable doubt not only of the guilt of a defendant in a traditional criminal prosecution but also of the dispositive fact or facts in any proceeding in which the state threatens to deprive an individual of his "good name and freedom." The two decisions, handed down less than three years apart, thus complement each other and point to the proper resolution of the case at bar: under *Specht,* this defendant is entitled to all the safeguards of due process of law, and under *Winship* those

---

[14]In a footnote at this point the opinion, in addition to citing numerous cases and commentaries, aptly reminds us of the effect of the stigma of prior mental illness on the 1972 vice-presidential candidacy of Senator Thomas F. Eagleton.

safeguards must include the standard of proof beyond a reasonable doubt.[15]

## III

The contrary arguments of the People are not persuasive. Running throughout the People's position is the view that the standard of proof beyond a reasonable doubt is not required because mentally disordered sex offender proceedings are "predictive in nature": i.e., inasmuch as the state is not trying to prove that the defendant committed a particular illegal act in the past but rather is "predisposed" to commit sex crimes in the future, fewer safeguards against factual error are required. The facile attractiveness of this theory, however, masks the weakness of its underlying assumption. The assumption is that predictive judgments are truly valid, and that the probability of error in such judgments is significantly less than the probability of error in judgments determining that specific past events occurred. As sometimes happens to our most cherished preconceptions, reality is otherwise.

In the light of recent studies it is no longer heresy to question the reliability of psychiatric predictions. Psychiatrists themselves would be

---

[15]In their extensive study the authors of *Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, likewise conclude that the proper standard in proceedings to commit persons who are both mentally disordered and dangerous to others is proof beyond a reasonable doubt. Their analysis is based on the approach of Justice Harlan in his concurring opinion in *Winship* (397 U.S. at pp. 370-372 [25 L.Ed.2d at pp. 378-380]). Justice Harlan posited that the choice of standard of proof should reflect the "comparative social disutility" of an erroneous outcome: the greater the interests a party has at stake in the proceeding, the greater the social cost of a mistaken decision and the higher the appropriate standard of proof. The law review authors reason that "The social costs of errors in the civil commitment process may . . . be determined by examining the extent of the resulting harm to the disadvantaged party. The deprivations with which the individual is threatened in commitment are comparable in magnitude, with respect to both the threatened loss of liberty and the stigmatization, to the potential deprivations in criminal cases." (Fn. omitted.) (87 Harv.L.Rev. at p. 1298.) The state's interest in avoiding an erroneous determination in the individual's favor will only be substantial if the authorities can accurately predict that he is highly likely to cause serious harm if released. However, "Current standards of dangerousness do not specify probabilities or magnitudes of harm, and because of the poor predictive capabilities of psychiatrists, individuals in the class of persons presently committed for dangerousness are relatively unlikely to commit dangerous acts. The disutilities of error are therefore much greater for the individual than they are for the state, and the reasonable doubt standard should be applied." (Fns. omitted.) (*Id.* at p. 1300; for other writers calling for this standard of proof in mentally disordered sex offender proceedings, see Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom* (1974) 62 Cal.L.Rev. 693, 750-751; Note, *Toward a Less Benevolent Despotism: The Case for Abolition of California's MDSO Laws* (1973) 13 Santa Clara Law. 579, 604-608; Comment, *The MDSO—Uncivil Civil Commitment* (1970) 11 Santa Clara Law. 169.)

the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession. It must be conceded that psychiatrists still experience considerable difficulty in confidently and accurately *diagnosing* mental illness.[16] Yet those difficulties are multiplied manyfold when psychiatrists venture from diagnosis to prognosis and undertake to predict the consequences of such illness: " 'A diagnosis of mental illness tells us nothing about whether the person so diagnosed is or is not dangerous. Some mental patients are dangerous, some are not. Perhaps the psychiatrist is an expert at deciding whether a person is mentally ill, but is he an expert at predicting which of the persons so diagnosed are dangerous? Sane people, too, are dangerous, and it may legitimately be inquired whether there is anything in the education, training or experience of psychiatrists which renders them particularly adept at predicting dangerous behavior. Predictions of dangerous behavior, no matter who makes them, are incredibly inaccurate, and there is a growing consensus that psychiatrists are not uniquely qualified to predict dangerous behavior and are, in fact, less accurate in their predictions than other professionals.' " (*Murel* v. *Baltimore City Criminal Court* (1972) *supra,* 407 U.S. 355, 364-365, fn. 2 [32 L.Ed.2d 791, 796-797] (Douglas, J., dissenting from dismissal of certiorari).)[17]

---

[16]The point has been dramatically illustrated by a recent experiment conducted by Dr. D. L. Rosenhan, professor of psychology and law at Stanford University. Eight sane people, including three psychologists, a psychiatrist, and a pediatrician, applied for admission to 12 different mental hospitals, feigning only to have heard voices saying "empty," "hollow," and "thud." In every other respect the pseudopatients behaved normally and furnished the examining physicians their actual life histories. Yet all 12 institutions admitted them as patients: of the 12 admissions, 11 were diagnosed as schizophrenic and one as manic-depressive. In other words, every one was incorrectly diagnosed as suffering from a severe mental illness. Moreover, immediately upon admission all the pseudopatients ceased simulating *any* symptoms of abnormality. Yet when they were eventually released, none was deemed "cured"; each was discharged, rather, with a diagnosis of schizophrenia "in remission." In short, each pseudopatient "was not sane, nor, in the institution's view, had he ever been sane." (Rosenhan, *On Being Sane in Insane Places* (1973) 13 Santa Clara Law. 379, 384; for other studies reaching similar conclusions, see Ennis & Litwack, *op. cit. supra* fn. 15, at pp. 708-711.)

[17]Justice Douglas' quotation is from testimony of Bruce J. Ennis, staff attorney of the New York Civil Liberties Union, given before the Subcommittee on Constitutional Rights of the United States Senate Committee on the Judiciary. Mr. Ennis is an experienced practitioner in the field of psychiatry and the law, and has authored such works as Legal Rights of the Mentally Handicapped (1973), Rights of Mental Patients (1973), and Prisoners of Psychiatry: Mental Patients, Psychiatrists, and the Law (1972). In the latter book Mr. Ennis states (at p. 227), "In a well-known New York study, psychiatrists predicted that 989 persons were so dangerous that they could not be kept even in civil mental hospitals, but would have to be kept in maximum security hospitals run by the Department of Corrections. Then, because of a United States Supreme Court decision [*Baxstrom* v. *Herold* (1966) 383 U.S. 107], those persons were transferred to civil hospitals. After a year, the Department of Mental Hygiene reported that one-fifth of

During the past several years further empirical studies have transformed the earlier trend of opinion into an impressive unanimity: "The evidence, as well as the consensus of opinion by responsible scientific authorities, is now unequivocal." (Diamond, *The Psychiatric Prediction of Dangerousness* (1975) 123 U.Pa. L.Rev. 439, 451.) In the words of spokesmen for the psychiatric profession itself, "Unfortunately, this is the state of the art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or 'dangerousness.' Neither has any special psychiatric 'expertise' in this area been established." (Task Force Report, Clinical Aspects of the Violent Individual (American Psychiatric Assn., 1974) p. 28.) And the same studies which proved the inaccuracy of psychiatric predictions have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not in fact take place ("false positives"), thus branding as "dangerous" many persons who are in reality totally harmless. (See generally *id.* at pp. 23-30.)

We need not lengthen this opinion by setting forth the various reasons for these limitations on the present-day practice of psychiatry; they are fully discussed in the literature.[18] Nor do we go so far as to join in the

them had been discharged to the community, and over half had agreed to remain as voluntary patients. During the year, only 7 of the 989 committed or threatened any act that was sufficiently dangerous to require retransfer to the maximum security hospital. *Seven correct predictions out of almost a thousand is not a very impressive record.*

"Other studies, and there are many, have reached the same conclusion: psychiatrists simply cannot predict dangerous behavior. They are wrong more often than they are right. And they always err by overpredicting dangerous behavior."

A number of reports on the consequences of the *Baxstrom* experience have been published, e.g., by Henry J. Steadman of the New York State Department of Mental Hygiene. Although the figures vary somewhat according to the duration of the post-release period considered, the overall results remain constant: only a very small proportion of the allegedly dangerous patients committed subsequent acts of violence.

[18]A representative sample of the copious outpouring of articles by psychiatrists and psychologists on these topics would include: Diamond, *The Psychiatric Prediction of Dangerousness* (1975) 123 U.Pa.L.Rev. 439; Monahan, *The Prevention of Violence,* in Community Mental Health and the Criminal Justice System (Monahan edit. 1975) p. ___; Steadman & Cocozza, *We Can't Predict Who is Dangerous* (1975) 8 Psych. Today 32; Steadman, *Some Evidence on the Inadequacy of the Concept and Determination of Dangerousness in Law and Psychiatry* (1973) 1 J. Psychiatry & L. 409; Rubin, *Prediction of Dangerousness in Mentally Ill Criminals* (1972) 27 Archives of Gen. Psychiatry 397; Wenk, Robison & Smith, *Can Violence be Predicted?* (1972) 18 Crime & Del. 393.

The principal recent articles in this field by legal writers, reporting generally on the foregoing studies and their juridical implications, are: Ennis & Litwack, *op. cit. supra* fn. 15, at pp. 711-734; von Hirsch, *Prediction of Criminal Conduct and Preventive Confinement of Convicted Persons* (1971) 21 Buffalo L.Rev. 717; Dershowitz, *The Law of Dangerousness: Some Fictions About Predictions* (1970) 23 J. Legal Ed. 24, 42-47; Dershowitz, *Psychiatry in the Legal Process: A Knife That Cuts Both Ways* (1968) 4 Trial 29; Livermore, Malmquist & Meehl, *On the Justifications for Civil Commitment* (1968)

conclusion of certain well-known writers that in civil commitment proceedings no psychiatrists should be permitted to give their opinions as to future dangerousness and that any commitment based on such an opinion constitutes a deprivation of liberty without due process of law.[19] ■ For our present purposes it is enough to hold that the requirement of proof beyond a reasonable doubt in mentally disordered sex offender proceedings is not negated by the "predictive" content of the ultimate finding. If anything, that aspect of the judgment reinforces our determination to require a high standard of proof on this issue: as a federal circuit court explained in a related context, "the inherently speculative nature of psychiatric predictions, resulting in confinement not for what one has done but for what one will do, demands more than minimal procedures, particularly when such confinement is accomplished outside the traditional criminal process, with its right to jury trial and other ancient safeguards." (*Sarzen* v. *Gaughan* (1st Cir. 1973) *supra*, 489 F.2d 1076, 1086.)[20]

---

117 U.Pa.L.Rev. 75, 81-85; *Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1240-1245.

[19]These are not the views of a radical fringe of either the psychiatric or legal professions. Dr. Bernard L. Diamond, professor of law and criminology and clinical professor of psychiatry at the University of California, is a nationally known specialist in this field. After a review of the relevant studies he concludes: "Neither psychiatrists nor other behavioral scientists are able to predict the occurrence of violent behavior with sufficient reliability to justify the restriction of freedom of persons on the basis of the label of potential dangerousness. Accordingly, it is recommended that courts no longer ask such experts to give their opinion of the potential dangerousness of any person, and that psychiatrists and other behavioral scientists acknowledge their inability to make such predictions when called upon to do so by courts or other legal agencies." (Diamond, *op. cit. supra*, fn. 18, p. 452.)

For the same reasons, Ennis and Litwack (*op. cit. supra* fn. 15, at pp. 735-738) urge that psychiatrists not be permitted to testify as experts in civil commitment proceedings because of the demonstrated inaccuracy of their predictive judgments, and conclude (at p. 743): "Justifying the deprivation of an individual's liberty on the basis of judgments and opinions that have not been shown to be reliable and valid should be considered a violation of both substantive and procedural due process. Certainly a procedure by which judges flipped coins to determine who would be committed would offend our sense of fundamental fairness. It is our contention that psychiatric judgments have not been shown to be substantially more reliable and valid." (Fn. omitted.) (See generally Ziskin, Coping with Psychiatric and Psychological Testimony (2d ed. 1975) *passim*.)

[20]Part of the problem, as recognized by a number of the writers cited above, lies in the imprecision of the definition of mentally disordered sex offender declared by section 6300 (fn. 1, *ante*). (See, e.g., Diamond, *op. cit. supra* fn. 18, p. 450, fn. 52; see generally *Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1253-1258; Swanson, *Sexual Psychopath Statutes: Summary and Analysis* (1960) 51 J.Crim.L.C. & P.S. 215, 220-222; Fahr, *Iowa's New Sexual Psychopath Law—An Experiment Noble in Purpose?* (1956) 41 Iowa L.Rev. 523, 532-539.) The court in *Ballay* saw a connection between this imprecision and the necessity for proof beyond a reasonable doubt: "While a more rigorous standard of proof may not allay infirmities in

The People next emphasize that mentally disordered sex offender proceedings presuppose a valid criminal conviction as a prerequisite to jurisdiction (*In re Bevill* (1968) *supra,* 68 Cal.2d 854), and that in each case, as here, such conviction was necessarily proved beyond a reasonable doubt. If the People mean that a person found to be a mentally disordered sex offender has had one bite of the "beyond a reasonable doubt" apple and should not be so greedy as to expect another, their point is refuted by the code itself.

The crime of which the defendant was found guilty need have no connection with sex at all: the statute explicitly states that mentally disordered sex offender proceedings may be instituted "When a person is convicted of any criminal offense, whether or not a sex offense" (§ 6302, subd. (a)). Manifestly, a charge of robbery or burglary or grand theft does not even put in issue any of the elements of the statutory definition of a mentally disordered sex offender. (§ 6300, fn. 1, *ante.*) Even in those cases in which the conviction was of a sex offense, the issues adjudicated in the criminal trial remain fundamentally different from those in the mentally disordered sex offender proceeding: in the former trial the questions for the jury are whether a specific sexual act violative of a statutory prohibition was committed, and if so, whether the defendant in fact committed that act with the requisite intent. (See Pen. Code, § 20.) But a single instance of sexual misconduct does not establish that the defendant is afflicted with "mental disease," nor that he is dangerously "predisposed" to repeat such offenses in the future. Even forcible rape, perhaps the most serious of sex crimes, is often wholly situational and takes place only because of a fortuitous concatenation of circumstances

substantive statutory elements it certainly may, and the reasonable doubt standard is designed particularly to, partially offset them by reducing the risk of factual error." (*In re Ballay* (1973) 482 F.2d 648, 667 [157 App.D.C. 59].) No such "offset," however, is found by the authors of *Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1296-1297, footnote 190, who point out that the reasonable doubt requirement "will not render the commitment standards less vague." They conclude (*ibid.*) that "the proper response to vague commitment standards is not to demand a high standard of proof but to declare the statute unconstitutional."

While the question of the vagueness *vel non* of section 6300 lurks in any consideration of the proper standard of proof in mentally disordered sex offender proceedings, defendant on this appeal does not raise—and we therefore do not reach—the contention that the section violates the due process clause of the California Constitution under the rules of such cases as *In re Newbern* (1960) 53 Cal.2d 786, 792-797 [3 Cal.Rptr. 364, 350 P.2d 116], and *Perez* v. *Sharp* (1948) 32 Cal.2d 711, 728-731 [198 P.2d 17], or the due process clause of the federal Constitution as applied in such decisions as *Papachristou* v. *City of Jacksonville* (1972) 405 U.S. 156 [31 L.Ed.2d 110, 92 S.Ct. 839], and *Giaccio* v. *Pennsylvania* (1966) 382 U.S. 399 [15 L.Ed.2d 447. 86 S.Ct. 518] (see also *United States* v. *Duardi* (W.D.Mo. 1974) 384 F.Supp. 874, 886 ("dangerous offender" statute held void for vagueness)).

not likely to recur. ■ Accordingly, the fact that the issues at the criminal trial were judged by the reasonable doubt standard has no bearing on how the distinct issues at the mentally disordered sex offender proceeding must be proved.

The People also assert that proof by a preponderance of the evidence is sufficient in mentally disordered sex offender proceedings "because the jury is in reality asked to confirm what is essentially a psychiatric diagnosis." This is a dismaying claim indeed. Surely we have not gone so far towards 1984 and Orwell's bleak prospect of "government by experts" that in a proceeding in which human liberty is at stake the function of our juries is reduced to "confirming" the guesses of doctors hired by the state. ■ A man facing indefinite confinement in a maximum security state mental institution because of what he is allegedly predisposed to do is entitled to a jury which impartially weighs the evidence, appraises with an open mind the credibility and persuasiveness of all the witnesses, and reaches its own independent judgment on the issues submitted to it. Anything less would make a mockery of the entire proceeding. As a recent commentator astutely observed, "If the purpose of the jury safeguard presently afforded by the MDSO statute is nothing more than to rubber-stamp the psychiatric opinion presented, the safeguard is now a meaningless sham and *the burden of proof irrelevant, since nothing is proved.*" (Italics added; fn. omitted.) (Note, *Toward a Less Benevolent Despotism: The Case for Abolition of California's MDSO Laws* (1973) 13 Santa Clara Law. 579, 606.)

■ Nor is there any reason why, as the People further contend, the state's burden of proof should be no greater than "the degree of assurance with which reputable psychiatrists express themselves." Psychiatrists—or any other witnesses, for that matter—are entitled to express themselves in court with any "degree of assurance" they please. The law is not concerned with how firmly *they* believe what they are saying, because they are not the ultimate arbiters of the defendant's fate. That awesome responsibility rests on the jury, and it cannot be evaded; however tentative the testimony of the witnesses may be, the jury is bound by oath to reach a decision or make every effort to do so. It is therefore the degree of assurance in the jurors' minds which matters. Of course, hesitant or conflicting testimony may well put the jury in doubt as to where the truth lies. But difficult as the jury's task may be in that event, the effect of an erroneous decision on the defendant is immeasurably greater. The law, in short, does not weaken the standard of proof merely because the evidence is weak.

No special exception from this principle is justified for psychiatrists. It is true we have held that medical witnesses, like any other experts, need not limit their testimony in criminal trials to matters on which they have opinions "beyond a reasonable doubt." (*People* v. *Phillips* (1966) 64 Cal.2d 574, 579, fn. 2 [51 Cal.Rptr. 225, 414 P.2d 353].) But it does not follow that the jury weighing that testimony is relieved of its higher duty. As we explained in *Phillips (ibid.)*, "We do not believe that the questions answered [by a physician witness] as to the effect of the surgery should have been framed in the terminology of 'beyond a reasonable doubt,' *which expresses the ultimate issue for the determination of the jury.*" (Italics added.)

Other examples of this joint operation of two different standards abound. Perhaps the most relevant is the defense of diminished capacity in murder trials. The assertion of such a defense typically results in psychiatrists' testifying both for and against the defendant on the crucial issue of whether at the time of the killing he lacked the necessary mental capacity to be guilty of murder in the first degree. On that issue the witnesses may properly speak with no more than "the degree of assurance with which reputable psychiatrists express themselves." But when the case is submitted to the jury that body is nevertheless required to determine the defendant's guilt of first degree murder beyond a reasonable doubt, even though the determination may turn on tentative or conflicting opinions of the medical experts. (See, e.g., *People* v. *Bassett* (1968) 69 Cal.2d 122, 139-140 [70 Cal.Rptr. 193, 443 P.2d 777], and cases cited.) The same rule applies in the case at bar.[21]

---

[21]The People draw their latter two arguments from *People* v. *Valdez* (1968) 260 Cal.App.2d 895, 904 [67 Cal.Rptr. 583], a case in which the Court of Appeal held that in narcotics addict commitment proceedings (Welf. & Inst. Code, § 3000 et seq.) the requirements of due process do not include proof beyond a reasonable doubt. In the same year this court uncritically accepted that conclusion in *People* v. *Moore* (1968) 69 Cal.2d 674, 685 [72 Cal.Rptr. 800, 446 P.2d 800], briefly noting there was "no sound reason" to depart from the ordinary civil standard of a preponderance of the evidence. We do not here adjudicate, of course, the question whether such a "reason" for a different rule in narcotics addict commitment proceedings appeared two years later in the *Winship* decision. But we note that in resolving the principal issue in *Moore*—i.e., whether illegally obtained evidence is admissible in narcotics addict commitment proceedings—we spoke in terms remarkably foreshadowing *Winship:* "It has been suggested that the narcotic addict proceeding is for the benefit of the addict and that therefore the state does not profit from its wrong when evidence obtained in violation of the Fourth and Fourteenth Amendments is admitted in such a proceeding. Certainly, the proceeding is in part for the benefit of the addict, but this is not determinative. Rehabilitation is one of the prime goals of our penal system, and the fact that the end result of incarceration in jail may be beneficial to the inmate furnishes no ground for the view that the state does not profit by using evidence to obtain criminal convictions. *Narcotic addict proceedings involve a loss of liberty, and the proceedings are for the benefit*

## IV

For the foregoing reasons we hold that the standard of proof beyond a reasonable doubt is required in mentally disordered sex offender proceedings by the due process clauses of article I, section 7, subdivision (a), of the California Constitution and the Fourteenth Amendment to the United States Constitution. Although the present case challenges an order of commitment made after a trial of the issue pursuant to section 6321, the same rule manifestly applies to any stage of the proceedings in which the person is committed or recommitted to the State Department of Health pursuant to a finding that he is a mentally disordered sex offender (e.g., §§ 6316, 6326, 6327). And because the major purpose of this rule is to overcome an aspect of those proceedings which "substantially impairs the truth-finding function," our decision today must be given complete retroactive effect. (*Ivan V.* v. *City of New York* (1972) 407 U.S. 203, 205 [32 L.Ed.2d 659, 661, 92 S.Ct. 1951] (holding *Winship* fully retroactive).)

In view of our disposition herein, it is unnecessary to reach Burnick's additional contentions.

The order appealed from is reversed.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**BURKE, J.**\*—I dissent. The "beyond a reasonable doubt" standard is wholly inappropriate to determine whether a person is a mentally disordered sex offender who is predisposed to the commission of sex offenses, dangerous to others, and in need of appropriate treatment in state institutions. In view of the considerable uncertainties inherent in attempting to predict human behavior, and the compelling state interest in treating sex offenders, it should be sufficient that the jury has found, by a preponderance of the evidence, that the defendant is an MDSO.

Welfare and Institutions Code section 6321, provides that the MDSO trial shall conform to the procedures for the trial of *civil* causes. In criminal cases, of course, a defendant is presumed innocent and the state

of society as well as the addict. [Citations.] *Whatever the label that may be attached to those proceedings, it is apparent that there is a close identity to the aims and objectives of criminal law enforcement* [citation], . . ." (Italics added.) (*Id.* at p. 682.)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

has the burden of proving him guilty beyond a reasonable doubt. (Pen. Code, § 1096.) But in civil cases, unless otherwise provided by law, proof by a preponderance of the evidence will suffice. (Evid. Code, § 115; see *In re Franklin,* 7 Cal.3d 126, 148.)[1]

The majority rely primarily upon *In re Winship,* 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], and *Specht v. Patterson,* 386 U.S. 605 [18 L.Ed.2d 326, 87 S.Ct. 1209], but neither case is controlling. In *Winship,* the United States Supreme Court required, as a matter of constitutional due process, that the "beyond a reasonable doubt" standard be applied during the adjudicatory phase of a juvenile delinquency proceeding. (See also *In re Kenneth W.,* 12 Cal.App.3d 1120, 1122 [91 Cal.Rptr. 702]; *In re Samuel Z.,* 10 Cal.App.3d 565, 569 [89 Cal.Rptr. 246]; *In re C.D.H.,* 7 Cal.App.3d 230, 234 [86 Cal.Rptr. 565].) The court reasoned (p. 365 [25 L.Ed.2d p. 376]) that "The same considerations that demand extreme caution in factfinding to protect the innocent adult apply as well to the innocent child. . . . We made clear in . . . [*In re Gault,* 387 U.S. 1, 36 (18 L.Ed.2d 527, 551, 87 S.Ct. 1428)] that civil labels and good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts, for '[a] proceeding where the issue is whether the child will be found to be "delinquent" and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution.' "

Unlike criminal or juvenile proceedings, however, wherein the *factual* issue of prior guilt or innocence must be resolved,[2] the issue before the court in MDSO proceedings is essentially predictive in nature, aimed at forecasting whether a person who has already been convicted of one criminal offense is likely to be dangerous to others by reason of a predisposition to commit sexual offenses. (Welf. & Inst. Code, § 6300.) In performing this predictive function, the court and jury must necessarily be guided in large part by psychiatric opinion which, by its very nature, is seldom conclusive beyond all reasonable doubt.

It should also be pointed out that, unlike criminal or juvenile proceedings, MDSO proceedings take place following a criminal trial at

---

[1]According to Witkin, "The phrase 'preponderance of evidence' is usually defined in terms of probability of truth; e.g., 'such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability of truth lies therein.' [Citations.]" (Witkin, Cal. Evidence, § 208, p. 189.)

[2]As stated in *In re Winship, supra,* 397 U.S. 358, 363 [25 L.Ed.2d 368, 375], "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions *resting on factual error.*" (Italics added.)

which defendant has been found guilty of a criminal offense beyond a reasonable doubt. The subsequent MDSO proceedings could be viewed as an alternative to penal sentencing, for the time spent under indeterminate commitment as an MDSO must be credited in fixing the term of sentence, in the event the MDSO is ultimately returned to court on the criminal charges. (Welf. & Inst. Code, § 6325; see *Humphrey* v. *Cady,* 405 U.S. 504, 510-511 [31 L.Ed.2d 394, 403-404, 92 S.Ct. 1048].) (It is true that an MDSO commitment could extend beyond the term of sentence which would have been imposed for the criminal offense. But as I point out below, adequate safeguards exist to assure that the term of commitment will not be unduly prolonged.)

Nor is *Specht* v. *Patterson, supra,* 386 U.S. 605, on point. In that case, the United States Supreme Court specified certain procedural rights which must, as a matter of due process, be afforded in MDSO proceedings, including the right to a hearing, the right to counsel, the right to confront and cross-examine witnesses, the right to present evidence, and the right to demand adequate findings by the court. *Specht* did not mention the right to a jury trial, much less indicate which proof standard should be applied to guide the jury's deliberations.[3] Under the California procedure, however, persons sought to be committed as MDSOs are provided a jury trial, along with the other rights specified in the *Specht* decision. Accordingly, this procedure would appear to satisfy the essential demands of due process of law.

I believe that an apt analogy can be found in the procedures (see Welf. & Inst. § 3100 et seq.) for the involuntary commitment of persons who have been found to be narcotics addicts or in imminent danger of addiction. In *People* v. *Moore,* 69 Cal.2d 674, 685 [72 Cal.Rptr. 800, 446 P.2d 800], we expressly rejected the contention that the facts supporting the commitment of such persons had to be established beyond reasonable doubt. As we pointed out in *Moore,* "The proceedings . . . are fundamentally civil in nature, and no sound reason appears to depart from that ordinary civil rule [preponderance of the evidence] here." (Accord: *People* v. *Valdez,* 260 Cal.App.2d 895, 902-904 [67 Cal.Rptr. 583].)

---

[3]Subsequently, in *Humphrey* v. *Cady, supra,* 405 U.S. 504, the court held that principles of equal protection require the availability of a jury trial for persons sought to be committed as MDSOs, since such a trial was available in ordinary civil commitment cases. Significantly, however, the court acknowledged that under the procedure at issue in that case, "If the State establishes the need for treatment *by a preponderance of the evidence,* the court must commit the defendant for treatment in lieu of sentence . . . ." The court made no suggestion that this procedure would be invalid, or that the jury should be held to a higher proof standard.

Similarly, MDSO proceedings are essentially civil in nature and are only collateral to criminal proceedings. (*In re Bevill,* 68 Cal.2d 854, 858 [69 Cal.Rptr. 599, 442 P.2d 679].) And although *In re Winship, supra,* 397 U.S. 358, cautions us to scrutinize with care the "civil" label of convenience, on balance I believe that the basic demands of due process are satisfied by the use of a preponderance of evidence test in MDSO cases. The court's observations in *People* v. *Valdez, supra,* 260 Cal.App.2d 895, 903-904, regarding narcotics addicts commitment procedures seem especially pertinent here: "Turning to due process, we may assume that in criminal cases it is part of the due process guaranteed by the Fourteenth Amendment that guilt must be established beyond a reasonable doubt. [Fn. omitted.] *In re De La O.,* 59 Cal.2d 128, 136-150 . . . [and other cases] have described narcotic commitment proceedings as 'civil,' 'nonpunitive' and 'remedial.' A situation may well arise where such characterization may break down in the face of the reality of the addict's involuntary confinement. (Cf. *In re Gault* [*supra*], 387 U.S. 1 . . . .) We do not believe, however, that the distinction between confinement as a criminal and loss of liberty as an addict whom the state hopes to cure is sufficiently artificial to prohibit a difference in the burden of proof. It must be remembered that in a narcotic commitment case the jury is in reality asked to confirm what is essentially a medical diagnosis. The People's burden of persuasion ought to be no greater than the degree of assurance with which reputable physicians express themselves. [Citation.]"

As I have pointed out, the trier of fact in MDSO proceedings is also charged with predicting future behavior and confirming what is essentially a medical diagnosis. I agree with the reasoning of *Valdez* that the state's burden of proof should correspond realistically with "the degree of assurance with which reputable physicians express themselves." The reasoning is even more compelling in cases involving psychiatric diagnoses. Of necessity, reasonable doubts accompany any attempt to predict human behavior.

The majority herein, contending that MDSO commitment proceedings are "criminal" in nature, rely primarily upon the fact that the MDSO may be ordered committed to state hospital for an indefinite period. Yet the statutory scheme contains ample protection against an abuse of discretion by hospital authorities in determining whether or not to release an MDSO.

First of all, under section 6317, the trial courts are empowered to "require the superintendent of the state hospital to make periodic reports to the court concerning the person's progress towards recovery." Moreover, under section 6327, after the MDSO has been confined for a period of not less than six months, the committing court may, on its own motion or on motion by the MDSO, "require the superintendent of the state hospital . . . to forward to the committing court, within 30 days, his opinion under (a) or (b) of Section 6325 [regarding the MDSO's amenability to treatment and progress toward recovery], including therein a report, diagnosis and recommendation concerning the person's future care, supervision, or treatment. After receipt of the report, the committing court may order the return of the person to the court for a hearing as to whether the person is still a mentally disordered sex offender . . . ." The MDSO may request additional hearings on his progress at six-month intervals.

Although the provisions of sections 6317 and 6327 appear to vest the committing court with some discretion whether or not to require the hospital officials to submit the reports specified in those sections, the courts should utilize these procedures whenever a doubt arises regarding the ability of the person committed to seek relief on his own behalf. As we noted in *In re Davis,* 8 Cal.3d 798, 806-807, footnote 6 [106 Cal.Rptr. 178, 505 P.2d 1018], it may be "inappropriate to place upon such [mentally disordered] persons the burden of initiating proceedings . . ." to secure habeas corpus relief.

The foregoing safeguards seem quite adequate to assure that persons such as defendant will be released after a reasonable period of treatment. Under the majority's holding, however, such persons will escape treatment and hospital confinement altogether unless the jurors conclude that MDSO status has been proved beyond a reasonable doubt. The majority's holding in this regard is constitutionally unnecessary and could drastically interfere with the effective functioning of the MDSO treatment program.

The majority suggest, in this case and in the companion case, *People* v. *Feagley, post,* page 338 [121 Cal.Rptr. 509, 535 P.2d 373], that the present system fails to provide adequate care and treatment for the MDSO. If true (and the record in these cases is wholly insufficient on the point), the proper solution is, I suggest, to establish and enforce safeguards which assure that such treatment is forthcoming, and not to erect procedural

barriers (such as impractical proof standards) which deprive both the public and the defendant himself of the benefits of the MDSO program.

I would affirm the order of commitment.

McComb, J., and Wood, J.,* concurred.

Respondent's petition for a rehearing was denied June 11, 1975. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.